**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **SID ZELLER**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**INSPIRE MEDICAL SYSTEMS, INC. d/b/a INSPIRE**,<br><br>Defendant. | Case No.<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Sid Zeller ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Inspire Medical Systems, Inc. d/b/a Inspire ("Inspire" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents as to all other matters:

## I.   INTRODUCTION

1.      This class action lawsuit arises out of Inspire's unlawful use of third-party tracking technologies by data brokers such as Alphabet, Inc. ("Google") to surreptitiously intercept and disclose its users' private and protected communications, including communications concerning highly sensitive personal health information, to third parties without users' knowledge or consent.

2.      By purposely embedding and deploying third party tracking technologies on Inspire's website, available at www.inspiresleep.com (the "Website"), Inspire engages in the unauthorized disclosure of its users' highly sensitive protected health information ("PHI") and

1

personally identifiable information ("PII" and together with PHI, "Sensitive Health Information") to third parties including, but not limited to, Google. Such disclosures of PHI and PII violate state and federal law.

3. Inspire offers a sleep apnea treatment called "Inspire therapy," which it describes as "the only implantable sleep apnea solution chosen by providers and patients for over a decade."[1] Inspire's Website also describes Inspire therapy as "a mask-free solution for people with obstructive sleep apnea who have tried and struggled with CPAP," or Continuous Positive Airway Pressure.[2] Inspire represents to its users and potential patients that "[t]hrough a simple-to-use system including the Inspire implant, remote and app, Inspire therapy enables you to control your [Obstructive Sleep Apnea] treatment from the palm of your hand."[3]

4. On its Website, Inspire encourages users to complete a quiz (the "Sleep Apnea Quiz") to determine if they qualify for Inspire's sleep apnea treatment.[4] Inspire's Website states that the Sleep Apnea Quiz "will ask for personal and health-related information."[5]

5. However, unbeknownst to users who took Inspire's Sleep Apnea Quiz on the Website, their communications were intercepted and disclosed to third parties through Inspire's use of third-party tracking technologies ("Tracking Tools"). These Tracking Tools track a user's activity on a website and send corresponding data to one or more third parties, including Google.

6. The Sensitive Health Information transmitted to unauthorized third parties by the Tracking Tools embedded on Inspire's Website included: (i) that the user suffers from Obstructive Sleep Apnea; (ii) that the user struggles with CPAP; (iii) the user's responses to questions on the

---

[1] *Homepage*, www.inspiresleep.com (last visited Jan. 26, 2026).
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*

Sleep Apnea Quiz; (iv) the zip code where the user is located and is searching for a treating physician; (v) the user's Sleep Apnea Quiz score; (vi) the final decision path taken from the Sleep Apnea Quiz, e.g., that the user submitted a "lead form" to Inspire regarding its Inspire therapy product; (vii) unique personal identifiers; (viii) specific search terms related to the provision of health care related to the user's sleep apnea; (ix) health conditions and symptoms; and (x) treatments.

7.      Health information is highly regulated by both state and federal law, including HIPAA, which imposes criminal penalties on disclosing individually identifiable health information ("IIHI") to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[6] Accordingly, Inspire's disclosure of Plaintiff's and each Class Member's Sensitive Health Information constitutes a violation of HIPAA.

8.      Inspire installed the Tracking Tools with the intent to collect and disclose users' Sensitive Health Information for purposes of financial gain.

9.      Plaintiff and Class Members never consented to, authorized, or otherwise agreed to allow Inspire to disclose their PHI and PII to anyone other than those reasonably believed to be part of Inspire, acting in a healthcare-related capacity. Despite this, Inspire knowingly and intentionally disclosed Plaintiff's and each Class Member's PHI and PII to Google and other third parties.

---

[6] 18 U.S.C. § 1320d-(6).

3

10.     Given Google's status as one of the world's largest online advertising companies, Plaintiff's and each Class Member's PHI and PII can and will likely be further used by or exposed to additional third parties.

11.     Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives like their PHI and the products they use to treat their health conditions. This information is then used as fuel for a massive, targeted advertising enterprise.

12.     Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is concerned about their health, it will collect that information and allow its clients to use that information to stream ads related to health treatments and services to that person's computers and smartphones.

13.     Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools").

14.     Armed with Google's Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

15.     But, in exchange for access to Google's Business Tools, website operators install Tracking Tools, *i.e.*, Google's surveillance software, on their website, including tracking pixels ("Pixels") and third-party cookies that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a

unique identifier that Google uses to identify that user called a Client ID ("CID"), regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

16.     In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

17.     Inspire is one of the companies that has chosen to prioritize its marketing efforts and profits over the privacy of its users and potential patients by installing Google's Tracking Tools on its Website.

18.     Plaintiff and each Class Member used the Website and had their personal Sensitive Health Information tracked by Inspire using the Tracking Tools. However, Inspire *never* obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to third parties, including Google, the largest advertiser and compiler of user information.

19.     As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

20.     Therefore, Plaintiff seeks, on behalf of himself and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*; (ii) the Minnesota Wiretap Statute, Minnesota Statute Chapter 626A.02; (iii) Invasion of Privacy; (iv) Negligence; (v) Breach of Implied Contract; and (vi) Unjust Enrichment.

## II.  PARTIES

### *Plaintiff Sid Zeller*

21.     Plaintiff Sid Zeller is a citizen of the State of Nevada, residing in Washoe County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

22.     In or around June 2025, Plaintiff utilized the Website on his personal electronic devices to take Inspire's Sleep Apnea Quiz in order to evaluate if Inspire's sleep apnea therapy products were conducive to treating his sleep apnea medical condition.

23.     Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that he communicated while using the Website, including while taking the Sleep Apnea Quiz. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were disclosed to third parties including Google, were: 1) that Plaintiff has been diagnosed with Obstructive Sleep Apnea; 2) that Plaintiff struggles with CPAP; 3) that Plaintiff was seeking treatment for his Obstructive Sleep Apnea and CPAP; 4) Plaintiff's responses to the questions on the Sleep Apnea Quiz, including his having participated in a sleep study, his body mass index ("BMI"), and his search for treating physicians; 5) the zip code where Plaintiff was located and sought a medical provider to treat his Obstructive Sleep Apnea; 6) that he had completed the Sleep Apnea Quiz; and 7) his Sleep Apnea Quiz score. As a result of Plaintiff completing the quiz, Defendant disclosed to third parties including Google, the information he shared with Defendant

through the Sleep Apnea Quiz.  Defendant also disclosed to third parties Plaintiff's PII, including the disclosure of his CID to Google.

24.    Plaintiff never authorized Defendant to disclose any aspect of his communications with Defendant through the Website to third parties, including the Sensitive Health Information that he provided to Defendant.

25.    On every occasion that he visited the Website, Plaintiff possessed an account with Google, and he accessed the Website while logged into his Google account on the same device.

26.    After providing his Sensitive Health Information to Defendant through the Website, Plaintiff immediately began seeing targeted online advertisements for health services and products related to sleep apnea.

***Defendant Inspire***

27.    Defendant Inspire Medical Systems d/b/a Inspire is a for-profit corporation incorporated in the State of Delaware with its principal place of business at 5500 Wayzata Blvd., Suite 1600, Golden Valley, Minnesota, which is in Hennepin County.

### III.  JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant.

29.    This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

7

30. This Court has general personal jurisdiction over Defendant because it maintains its principal place of business at 5500 Wayzata Blvd., Suite 1600, Golden Valley, Minnesota.

31. This Court has specific personal jurisdiction over Defendant because Defendant is headquartered in Golden Valley, Minnesota and conducts significant operations in this District.

32. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District. Defendant is a corporation with its principal place of business in Golden Valley, Minnesota, and therefore resides in this judicial District for venue purposes under 28 U.S.C. § 1391(c)(2).

## IV. FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES.

#### i. Google's Mass Advertising Surveillance Operation.

33. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[7] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[8]

34. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[9] But in

---

[7] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively (last visited Jan. 26, 2026).

[8] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Jan. 26, 2026).

[9] *Welcome to Google Analytics*, GOOGLE,

order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[10]

35.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third-party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[11]

36.    Google also admits that it uses the information collected from third-party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[12]

37.    While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. The vague descriptions of Google's data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

---

 https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Jan. 26, 2026).

[10] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Jan. 26, 2026).

[11] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Jan. 26, 2026).

[12] *Id.*

38.    Google aggregates the user information that it collects from third-party websites into "advertising profiles" consisting of all of the data that it has collected about a given user.[13] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[14]

39.    Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[15] and Google trackers are present on 74-percent of all web traffic.

40.    Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

   a.    Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[16] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds

---

[13] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at* https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[14]    *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Jan. 26, 2026).

[15] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 26, 2026).

[16] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Jan. 26, 2026).

a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[17]

b.  81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[18]

c.  93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[19] In fact, Google advertising trackers were found on 73-percent of pornography websites.[20]

41.    This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[21]

42.    In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[22]

43.    When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy.

---

[17] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Jan. 26, 2026).
[18] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at* https://pubmed.ncbi.nlm.nih.gov/31002321/.
[19] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at* https://journals.sagepub.com/doi/10.1177/1461444820924632.
[20] *Id.*
[21] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Jan. 26, 2026).
[22] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 26, 2026) ("Google Analytics gives you the tools, free of charge"),

44.     For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[23]

45.     Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[24]

46.     And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[25]

47.     Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours—or 30.5 working days—to read the privacy policy of every new website that they visited in a single year.[26]

**ii.     Pixels Can Record Almost Every Interaction Between a User and a Website.**

48.     In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto the Website.

49.     Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

---

[23]     *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Jan. 26, 2026).
[24] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).
[25] *Id*.
[26] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

12

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[27]

50.     Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[28]

51.     But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams

---

[27] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Jan. 26, 2026).

[28] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Jan. 26, 2026); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Jan. 26, 2026).

have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[29]

### iii. The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to Google.

52. Every website is hosted by a computer "server" that holds the website's contents.

53. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

54. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information—the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

55. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as "cookies" on the user's device.[30] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[31] For example, in a more innocuous use case, a cookie

---

[29] *Lurking Beneath the Surface, supra* note 27.
[30] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Jan. 26, 2026).
[31] *Id.*

may allow the website to remember a user's name and password, language settings, or shopping cart contents.[32]

56.     When a Google user logs onto their account, their web browser records a Google tracking cookie.[33] This cookie includes a specific line of code that links the web browser to the user's Google account.[34]

57.     Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (e.g., type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

58.     Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

59.     The Pixels then combine the data received from the browser with the data acquired from the cookie and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

60.     A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-half of Americans over fifteen (15)

---

[32] *Id.*
[33] Cyphers, *supra*, n. 13.
[34] *Id.*

years of age.[35] When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

61.      However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.[36]

62.      Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

63.      An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[37] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[38] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint

---

[35] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Jan. 26, 2026) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Jan. 26, 2026). Approximately 284.1 million persons in the United States are fifteen (15) years of age or older. *See* United Nations, Department of Economic and Social Affairs, Population Division (2024). World Population Prospects 2024 (Online Edition), *United States Population Pyramid,* https://www.populationpyramids.org/united-states (last visited Jan. 30, 2026). Of these, approximately 89.45% (or approximately 254.1 million) use email. *See* Statista, *Percentage of internet users in the United States who use e-mail as of November 2023, by age group*, https://www.statista.com/statistics/271501/us-email-usage-reach-by-age/ (last visited Jan. 30, 2026).

[36] *See Client ID vs User ID in Google* Analytics, GLIDE AD AGENCY, https://glideagency.com/client-id-vs-user-id-in-google-analytics/ (last visited Jan. 26, 2026).

[37] Cyphers, *supra* note 13.

[38] *Id.*

becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**iv.    Defendant Disclosed Plaintiff's and Class Members' Sensitive Health Information to Google.**

64.    Plaintiff and Class Members used Inspire's Website to research and access health treatments and services related to sleep apnea. While visiting Inspire's Website, Plaintiff and Class Members each took Inspire's Sleep Apnea Quiz.

65.    Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant through the Website to third parties, including Google.

66.    The following screenshots ("Figures 1-4") depict examples of the network transmissions made by the Google Tracking Tools installed on the Website when users complete Inspire's Sleep Apnea Quiz.

67.    As Figures 1-4 show, when users complete the Sleep Apnea Quiz on the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website includes the user's Client ID, or CID, as well as that the user suffers from Obstructive Sleep Apnea, the user struggles with CPAP, the user participated in a sleep study less than 2 years ago, the user's exact Body Mass Index score ("BMI") with a specific note that it exceeds 40, the zip code where the user was located and was searching for treating physician, the user's Sleep Apnea Quiz score, and the final decision path taken from the Sleep

Apnea Quiz, e.g., that the user submitted a "lead form" to Inspire regarding its Inspire therapy product.





*Figures 1-4. Screenshots depicting back-end network traffic from the Website which shows information transmitted to Google when Website users take the Sleep Apnea Quiz.*

68.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff to his identity. The following screenshot ("Figure 5") shows that the Google Pixel on the Website transmitted the identifier numbers attached to Google's 'cid' cookie, which identifies the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the

19

user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.



*Figure 5. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users take the Sleep Apnea Quiz.*

69.     In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as the URLs visited by internet users.[39]

70.     Defendant purposely configured the Google Pixels on the Website to collect and transmit additional user data, including information related to the Sleep Apnea Quiz.

---

[39] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited Jan. 26, 2026).

**B.**    **DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT.**

     **i.**    **Defendant Failed to Inform Plaintiff and Class Members of its Disclosure of their Sensitive Health Information.**

71.    Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google.

72.    Specifically, Plaintiff and Class Members had a reasonable expectation of privacy. Defendant did not inform Plaintiff that it was sharing his Sensitive Health Information with third parties, including Google.

73.    By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

74.    Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

     **ii.**    **The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members.**

75.    The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users such as Plaintiff and Class Members were unable to detect the Tracking Tools on the Website.

76.    Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

77. Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

78. Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES.

### i. Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information.

79. As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on its website.

80. Upon information and good faith belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Health Information.

### ii. Plaintiff's and Class Members' Data Had Financial Value.

81. Plaintiff's and Class Members' Sensitive Health Information has value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

82. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average

22

American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[40]

83.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

84.    Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[41] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[42]

85.    Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

86.    The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm to Plaintiff and Class Members.

---

[40] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/    (last visited Jan. 26, 2026).

[41] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[42] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

**D.     DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.**

87.     The disclosure of Plaintiff's and Class Members' Sensitive Health Information via Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Sensitive Health Information.[43]

88.     The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[44]

89.     While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

90.     Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply *not* permitted to use tracking technology tools in a way that exposes Sensitive Health

---

[43] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Jan. 26, 2026).

[44] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited Jan. 26, 2026) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

Information to any third party without express and informed consent.

91.    Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[45]

92.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

93.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

94.    Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: (1) if an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination;'" or (2) if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or

---

[45]    HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

95.    The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare providers like Inspire—to maintain appropriate safeguards to protect the privacy of PHI and set limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

96.    Even the fact that an individual is receiving a medical service, ..g., is a patient of a particular entity, can be PHI.

97.    The U.S. Department of Health and Human Services ("HHS") has instructed health care providers that, while identifying information taken from a public source (such as a phonebook) is not necessarily PHI  unless it is related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[46]

98.    Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each

---

[46]    *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html  (last visited Jan. 26, 2026).

person on the list."[47]

99.    Defendant provided PHI of Plaintiff and Class Members to third parties in violation of the Privacy Rule.

100.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

101.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

      a.    Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

      b.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

      c.    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

      d.    Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to IIHI in violation of 45 C.F.R. § 164.306(a)(3);

      e.    Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in

---

[47] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Jan. 26, 2026).

violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

f.   Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

102.   In its 2012 *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, HHS instructed:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[48]

103.   Moreover, in its 2003 *Guidance regarding Marketing*, HHS instructed:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[49]

104.   For years, HHS has repeatedly instructed that patient status is protected by the

---

[48] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available online at:
 https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.
[49]*Marketing* , HHS,
https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf  (April 3, 2003) (last visited Jan. 26, 2026).

HIPAA Privacy Rule:

> a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);
>
> b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and
>
> c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

105. In other words, HHS has expressly stated that the conduct alleged herein, i.e. implementing Tracking Technologies without adequate disclosure or consent, violates HIPAA Rules. . Accordingly, several courts, including in this District, have enforced the HIPAA Rules, under near-identical circumstances.[50]

## E. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY.

106. At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

107. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

108. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling

---

[50] *See, e.g.*, *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 928 (D. Minn. 2024).

or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[51]

109.    Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[52]

110.    And, in a study performed by the National Institutes of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[53]

111.    Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

## V.  TOLLING AND ESTOPPEL

112.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

113.    By design, the Tracking Tools on the Website were and are invisible to the average website visitor.

114.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

---

[51] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Jan. 26, 2026).

[52] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[53] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

115. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

116. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to users, including Plaintiff and Class Members, that by taking the Sleep Apnea Quiz on the Website, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

117. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' Sensitive Health Information. To date, however, Defendant has not conceded, acknowledged, or otherwise indicated to its users that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

118. Moreover, all applicable statutes of limitation have been tolled pursuant to the discovery rule.

119. The earliest that Plaintiff or Class Members, acting with due diligence, could reasonably discover Defendant's conduct was shortly before the filing of this Complaint, and well within any applicable statute of limitations.

## VI. CLASS ALLEGATIONS

120. This action is brought by the named Plaintiff on his behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure.

121. Specifically, the Class that Plaintiff seeks to represent is defined as follows:

All natural persons who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

122. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

123. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

124. This case satisfies the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23(a) for all class certifications.

125. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. According to a May 6, 2025 Facebook post from Inspire, "100,000 people (and counting!) have now been implanted with Inspire therapy." As such, at least 100—and likely many more—patients and other Website users have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

126. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

    a)     Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

    b)     Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c)      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d)      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e)      Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Sensitive Health Information;

f)      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g)      Whether Defendant violated the statutes asserted as claims in this Complaint;

h)      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i)      Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy practices; and

j)      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

127.    **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised by Defendant's incorporation and use of the Tracking Tools, which transmitted to Google and other third parties all Sensitive Health Information collected by Defendant.

128.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff

has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation involving the improper use of tracking software, and Plaintiff intends to prosecute this action vigorously.

129. This matter also satisfies the predominance, superiority, and manageability requirements of class certification under Fed. R. Civ. P. 12(b)(3).

130. **Predominance**. As alleged herein, Defendant engaged in a common course of conduct toward Plaintiff and Class Members in that all of the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendant's conduct set out in Paragraph 125 above affect all Class Members and predominate over any individualized issues.

131. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and therefore would have no effective remedy. The prosecution of separate actions by individual Class Members would also create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties and conserves judicial resources and the parties' resources, while still protecting the rights of the Parties.

132. Class certification under Fed. R. Civ. P. 23(b)(3) is further supported because:

a. Class Members have little interest in individually controlling the prosecution of their claims given the modest amount recoverable individually, the expense of prosecuting

an individual action, and the technical complexity of proving the misconduct alleged herein;

b. to date, no litigation of a similar nature has been commenced against Defendant by any other Class Member;

c. it is desirable to concentrate the litigation specifically in this District, because Defendant and the relevant employees, documents, computers, and software are located here; and

d. no particular difficulties in managing this case as a class action are anticipated.

133. In the alternative, class certification is warranted under Fed. R. Civ. P 23(b)(2) because Defendant acted on grounds that apply generally to the Class as a whole. Defendant's collection and unauthorized transmission of Sensitive Health Information was consistent throughout the Class Period and did not vary among Class Members. Therefore, class certification, final injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

134. Even if the Court determines that class certification is not warranted under Fed. R. Civ. P. 23(b), this action may be brought or maintained as class action with respect to particular issues under Fed. R. Civ. P. 23(c)(4)because resolution of these issues, which are common to all Class Members, would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

135.    Finally, all members of the proposed Class are readily ascertainable. It can be assumed that an ordinary person knows whether or not they entered their own health information on the Inspire website. Defendant collected and presumably still has access to the name and email address of every person who entered health data on Defendant's Website. Accordingly, such persons can be notified of their membership in the Class by email and/or first-class mail, supplemented by publication notice if necessary.

**COUNT I**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1),** *et seq*.
**Unauthorized Interception, Use, and Disclosure**
*(On Behalf of Plaintiff and the Class)*

136.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

137.    The ECPA protects both sending and receipt of communications.

138.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

36

139.    The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

140.    Electronic Communications. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

141.    Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

142.    Interception. The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

143.    Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiff's and Class Members' browsers;

b.    Plaintiff's and Class Members' computing devices;

c.    Defendant's web-servers; and

d.    The Pixel code deployed by Defendant to effectuate the sending and acquisition of user and Website user communications.

144.     By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

145.     Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels and Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Sensitive Health Information to third parties such as Google.

146.     Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including information related to the Sleep Apnea Quiz.

147.     By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

148.     By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

149.     Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

150. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

151. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

152. Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Breach of confidence;

c. Breach of fiduciary duty;

d. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

153. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

154. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Health Information with Google and other third-parties that did not participate in these communications, that Plaintiff

and Class Members did not know were receiving their Sensitive Health Information, and that

Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

155.    As such, Defendant cannot viably claim any exception to ECPA liability.

156.    Plaintiff and Class Members have suffered damages as a direct and proximate result

of Defendant's invasion of privacy in that:

a.    Learning that Defendant have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

d.    Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e.    The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

157.    Defendant intentionally used the wire or electronic communications to increase its

profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and

Class Members' Sensitive Health Information for financial gain.

158.    Defendant was not acting under color of law to intercept Plaintiff's and Class

Members' wire or electronic communication.

40

159. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

160. Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

161. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

162. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorneys' fees and costs.

**COUNT II**
**VIOLATIONS OF THE MINNESOTA WIRETAP STATUTE**
**Chapter 626A.02**
*(On Behalf of Plaintiff and the Class)*

163. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

164. The Minnesota Wiretap Statute, Minn. Stat. 626A, protects against the intentional interception, attempted interception, or the procurement of another person to intercept or attempt to intercept any wire, oral, or electronic communication. *See* Minn. Stat. 626A.02, Subd. 1.

165. The Minnesota Wiretap Statute further provides that any person who:

> (2) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic mechanical, or other device to intercept any oral communication when:

41

(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

(ii) such device transmits communications by radio, or interferes with the transmission of such communication;

(3) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, kn0owing or having reason to know that the information was obtained in violation of this subsection;

(4) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

Minn. Stat. 626A.02.

166.    Additionally, a person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of Chapter 626A may recover from the person or entity that engaged in violation:

1. Temporary and other equitable or declaratory relief as may be appropriate;

2. Damages under subd. 3 . . . ; and

3. A reasonable attorney's fee and other litigation costs reasonably incurred.

Minn. Stat. 626A.13, Subd. 2.

167.    The transmission of Plaintiff's and the Class Members' Sensitive Health Information violates the Minnesota Wiretap Statute. First, the transmissions from Plaintiff and the Class Members to Defendant, through the Website, are wire communications pursuant to Minn. Stat. 626A.01, Subd. 3.

168. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Minn. Stat. 626A.01, Subd. 5.

169. "Contents" means "when used with respect to any wire, electronic, or oral communication, includes any information concerning the substance, purport, or meaning of that communication." Minn. Stat. 626A.01, Subd. 8.

170. "Electronic, mechanical or other device" means "any device or apparatus which can be used to intercept a wire, electronic, or oral communication." Minn. Stat. 626A.01, Subd. 6.

171. Here, Plaintiff's and Class Members' browsers and computing devices and Defendant's webservers, Website, and the Pixel code Defendant deployed are all "devices" for the purposes of the Minnesota Wiretap Statute.

172. "Electronic communication" means "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system but does not include:

> (1) a wire or oral communication;
>
> (2) a communication made through a tone-only paging device; or
>
> (3) a communication from a tracking device, defined as an electronic or mechanical device which permits the tracking of the movement of a person or object.

Minn. Stat. 626A.01, Subd. 14.

173. By employing and embedding Pixels and Tracking Tools on the Website, Defendant intentionally violated the Minnesota Wiretap Statute, through its interception, attempt at interception, and its procurement by Google to intercept the electronic communications of Plaintiff and the Class Members.

174. Indeed, Defendant willfully used or attempted to use the contents of Plaintiff's and the Class Members' electronic communications, knowing that the information was obtained through interception.

175. Defendant's use of the Pixels and Tracking Tools unlawfully and intentionally disclosed Plaintiff's and the Class Members' Sensitive Health Information to Google. These intentional acts violate Minn. Stat. 626A.02.

176. Defendant had no legitimate purpose for intentionally intercepting the contents of Plaintiff's and the Class Members' private, and personal electronic communications. And even if Defendant could identify some legitimate purpose, it would not outweigh the egregious breach and invasion of privacy Defendant has committed against Plaintiff and the Class Members.

177. At no time did Plaintiff or the Class Members provide their consent to Defendant's disclosure of their Sensitive Health Information to Google and/or other third parties.

178. Defendant has improperly profited from its invasion of Plaintiff's and the Class Members' privacy in its use of their data for its economic value.

179. Plaintiff and the Class Members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

180. To the extent Defendant's conduct is ongoing, and it continues to unlawfully disclose the communications of Plaintiff and the Class Members without their consent, Plaintiff and the Class Members are entitled to declaratory and injunctive relief to prevent future unlawful and unauthorized disclosure of Plaintiff's and the Class Members' Sensitive Health Information.

181. Pursuant to Minn. Stat. 626A.13, Subd. 3, the Court may assess damages by: (1) the sum of three times the actual damages suffered by the plaintiff and any profits made by the violator

as a result of the violation; or (2) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, whichever is greater of option (1) and option (2).

182.  As a direct and proximate result of Defendant's conduct and pursuant to the Minnesota Wiretap Statute, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; and reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT III
## COMMON LAW INVASION OF PRIVACY
### *(On Behalf of Plaintiff and the Class)*

183.  Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

184.  Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

185.  Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

186.  Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

187.  Defendant's interception and disclosure of the substance and nature of those

45

communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

188.    Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

189.    Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

190.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

191.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

192.    Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

193.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

194.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT IV**
**NEGLIGENCE**
*(On Behalf of Plaintiff and the Class)*

195.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

196.    Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such information would be kept confidential.

197.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

198.    Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

199.    Defendant further negligently omitted to inform Plaintiff and the Class that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

200.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

201.    Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

202.    Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

203.    Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health

Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT V
### BREACH OF IMPLIED CONTRACT
*(On Behalf of Plaintiff and the Class)*

204.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

205.    When Plaintiff and Class Members provided their Sensitive Health Information to Defendant in exchange for information and services related to sleep apnea, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

206.    Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

207.    Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

208.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Health Information to third parties like Google.

209.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

210.    Plaintiff and Class Members would not have used Defendant's services, or would

have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

211.   Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

## COUNT VI
## UNJUST ENRICHMENT
### *(On Behalf of Plaintiff and the Class)*

212.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

213.   Plaintiff pleads this claim in the alternative to his breach of implied contract claim.

214.   Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for information and services related to sleep apnea. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

215.   Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

216.   In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

217.   Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its user's and Sensitive Health Information.

49

218.    Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

219.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

220.    Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

221.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

222.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and other Class Members, prays for judgment against Defendant as follows:

A.    an Order certifying the Class, and appointing the Plaintiff and his Counsel to represent the Class;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C.    injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.    an award of all damages available at equity or law, including, but not

50

limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.      an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      prejudgment interest on all amounts awarded; and

G.      all such other and further relief as this Court may deem just and proper.


Dated: January 30, 2026                            Respectfully submitted,

                                                   _/s/ Kent M. Williams_____
                                                   Kent M. Williams (MN Bar No. 0222884)
                                                   Tyler J. Bean*
                                                   Sonjay C. Singh*
                                                   **SIRI & GLIMSTAD LLP**
                                                   745 Fifth Avenue, Suite 500
                                                   New York, New York 10151
                                                   Tel: (212) 532-1091
                                                   E: kent.williams@sirillp.com
                                                   E: tbean@sirillp.com
                                                   E: ssingh@sirillp.com

                                                   Matthew J. Langley*
                                                   Christopher M. Nienhaus*
                                                   **ALMEIDA LAW GROUP LLC**
                                                   849 W. Webster Ave.
                                                   Chicago, Illinois 60614
                                                   Tel.: (773) 554-9354
                                                   matt@almeidalawgroup.com
                                                   chris@almeidalawgroup.com

                                                   *pro hac vice forthcoming

51

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and other members of the proposed Class, hereby demands a jury trial on all issues so triable.

Dated: January 30, 2026

Respectfully submitted,

*/s/ Kent M. Williams*
Kent M. Williams